607 So.2d 55 (1992)
Thomas E. SHUTZE
v.
CREDITHRIFT OF AMERICA, INC., a Corporation.
No. 89-CA-0591.
Supreme Court of Mississippi.
July 29, 1992.
*57 J.B. Van Slyke, Jr., Hattiesburg, for appellant.
F. Marvin Morris, III, Morris & Sakalarios, Hattiesburg, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This is a lien priority case. The holder of a second deed of trust securing future advances made such an advance after a junior creditor had enrolled his judgment and perfected his lien. The Chancery Court enforced the future advance clause and assigned its lien a priority relating back to the recording of the original deed of trust, priming the judgment lien.
We affirm on this issue, although we remand for further proceedings on another.

II.
In the early 1980s, Hobart W. Gentry, Jr., and Georgia C. Gentry owned Lot 53 of Rosewood Heights Subdivision to the City of Hattiesburg, Mississippi, commonly known by street number as the residence at 1105 North 34th Avenue. At all times relevant hereto, this property has been subject to the lien of a deed of trust, the beneficiary of which was Deposit Guaranty Mortgage Company and its predecessors in interest. The Deposit Guaranty lien was a conventional, residential first mortgage.
The first of today's combatants is Credithrift of America, Inc. On April 8, 1981, the Gentrys negotiated a second mortgage, home equity loan with Credithrift, borrowing the sum of $23,679.36. The Gentrys executed and delivered a second deed of trust conveying a security interest in the 34th Avenue property to Ben Hendrix, trustee for the benefit of Credithrift, and this deed of trust was duly recorded in the land records of Forrest County, Mississippi. Of considerable consequence, this deed of trust contains a future advance clause, in legal colloquia sometimes a "dragnet clause," which reads as follows:
In addition to the indebtedness specifically mentioned above and any and all extensions or renewals of the same or any part thereof, this conveyance shall also cover such future and additional advances as may be made to the Grantor, or either of them, by the beneficiary... .
The clause went on to provide that the conveyance in trust secured
any and all debts, obligations, or liabilities, direct or contingent, of the grantor herein, or either of them, to the beneficiary, whether now existing or hereafter arising at any time before actual cancellation of this instrument on the public records of mortgages and deeds of trust, whether the same be evidenced by note, open account, overdraft, endorsement, guaranty or otherwise.
Nothing in any of the papers obligated Credithrift to make any future advances.
Over the next two years or so, the Gentrys made intermittent payments to Credithrift, reducing their indebtedness, and on July 12, 1983, refinanced the balance, giving a new note in the principal amount of $14,150.26, and a new (arguably superfluous) deed of trust. The original April 8, 1981, deed of trust, however, was not cancelled of record and, indeed, it is apparent *58 Credithrift regarded the refinancing of July, 1983, as a "renewal of the ... [original indebtedness]" pursuant to the dragnet clause of the April 8, 1981, deed of trust.
Enter Thomas E. Shutze, our other combatant. Shutze resides in Lamar County, Mississippi, and apparently had business dealings with the Gentrys, the nature of which is not disclosed in the record, nor is it important, except that on September 20, 1984, the County Court of Forrest County entered a judgment in favor of Shutze and against Hobart W. Gentry, Jr., in the original principal sum of $4,541.78. This judgment was duly enrolled in Forrest County on October 23, 1984, and its lien thereupon acquired the powers our law provides.
Re-enter Credithrift  eleven months later. By this time, the Gentrys had reduced their indebtedness to Credithrift to $11,215.13. On August 23, 1985, the Gentrys again refinanced  "renewed"  their loan with Credithrift and executed a new note in the principal sum of $14,150.26, repayable in installments at interest. The future advance  "the new money"  the Gentrys received was $2,784.13. Credithrift again regarded the renewal and advance as within the dragnet clause of the 1981 deed of trust which it in no way cancelled or released, although it did take the precaution of a new deed of trust.
Over the next several years, the Gentrys struggled financially. It appears they made their payments to Credithrift through the Spring of 1988. At some point thereafter, they abandoned all and left for the West Coast and are believed in Reseda, California. Their creditors immediately resorted to the 34th Avenue residence to satisfy their respective debts.
No one questions that Deposit Guaranty Mortgage Company held a good, valid and perfected first lien and security interest by virtue of its 1978 deed of trust. Second mortgage holder Credithrift and judgment lien creditor Shutze, however, litigated below regarding their respective rights, and particularly the priority thereof with regard to Credithrift's future advance of $2,784.13 made after Shutze perfected his judgment lien. It appears in the Summer of 1988, Credithrift appointed a substituted trustee under the original April 1, 1981, deed of trust and that on July 12, 1988, the trustee foreclosed on the Gentrys' property and sold it to Credithrift, the sole bidder, for the sum of $10,739.65, the amount of the Gentrys' indebtedness to Credithrift as of that day. The foreclosure, of course, was subject to Deposit Guaranty Mortgage's prior rights. Credithrift has since made its peace with the first mortgage holder, paying off its indebtedness and acquiring its rights.
The Chancery Court of Forrest County resolved the remaining controversy in favor of Credithrift. The Court first held that Credithrift's 1981 deed of trust contained a valid and enforceable dragnet clause securing all refinancing, renewals, and future advances and that this included the sums Credithrift advanced to the Gentrys on August 23, 1985. The Court acknowledged that Shutze had obtained a judgment against Hobart W. Gentry, Jr., on September 23, 1984, and that he had enrolled that judgment on October 23, 1984. The Court found, however, that at the time of the August, 1985, refinancing and advance to the Gentrys, Credithrift "had no actual notice of the plaintiff's [Shutze] judgment." On this basis, the Chancery Court held that Shutze's judgment lien was wholly junior and subordinate to the lien of Credithrift's 1981 deed of trust and, further, that Credithrift's foreclosure on July 12, 1988, extinguished Shutze's judgment lien vis-a-vis the 34th Avenue property. The Court in effect confirmed Credithrift's foreclosure and adjudged that Shutze take nothing.
Shutze now appeals to this Court.

III.
Future advance clauses are enforceable according to their tenor. Accepting their creative and constructive role in a credit economy and, as well, freedom of contract, we have upheld such clauses for more than a century. See Coleman v. Galbreath, Stewart, & Co., 53 Miss. 303, 306 (1876). The point has been repeatedly litigated since, and we have repeatedly *59 ruled, incident to a secured transaction, the debtor and secured party may contract that the lien or security interest created thereby shall secure other and future debts which the debtor may come to owe the secured party. Such clauses are treated like any other provisions in a contract and will be enforced at law subject only to conventional contract defenses, e.g., fraud, duress, and the like, none of which are present here.
We noted the practical rationale for such clauses in Newton County Bank v. Jones, 299 So.2d 215 (Miss. 1974).
When inserted in a deed of trust, such a clause operates as a convenience and an accommodation to . .. [borrowers]. It makes available additional funds without ... [their] having to execute additional security documents, thereby saving time, travel, loan closing costs, costs of extra legal services, recording fees, et cetera.
Newton County Bank, 299 So.2d at 218. And so Whiteway Finance Co., Inc. v. Green, 434 So.2d 1351 (Miss. 1983) but repeats the obvious when it says matter-of-factly, as between the parties, "`dragnet clauses' are valid and enforceable in Mississippi."[1]Whiteway Finance, 434 So.2d at 1353. See also, Kelso v. McGowan, 604 So.2d 726, 729 (Miss. 1992); Merchants National Bank v. Stewart, 608 So.2d 1120, 1125 (Miss. 1992); Cochran v. Deposit Guaranty National Bank, 509 So.2d 1045, 1047 (Miss. 1987); Trapp for Use and Benefit, etc. v. Tidwell, 418 So.2d 786, 792 (Miss. 1982); Newton County Bank v. Jones, 299 So.2d 215, 217 (Miss. 1974); Holland v. Bank of Lucedale, 204 So.2d 875 (Miss. 1967); Walters v. M & M Bank of Ellisville, 218 Miss. 777, 784-85, 67 So.2d 714, 717-18 (1953); In Re Oswalt, 41 B.R. 868 (N.D.Miss. 1983); see generally, G. Nelson & D. Whitman, Real Estate Finance Law § 12.8 (2d Ed. 1985); Restatement of the Law (Third), Property-Security (Mortgages) § 2.1 (Tent.Dr. No. 1, March 22, 1991).
There can be no question but that, vis-a-vis the Gentrys, the lien or security interest[2] Credithrift held in the 34th Avenue residence secured all sums the Gentrys owed Credithrift through and including the 1985 refinancing, renewal and new advance.

IV.

A.
Shutze accepts all of this but argues, instead, it proves little regarding the conflicting priorities issue he tenders. More specifically, Shutze concedes the 1981 deed of trust established Credithrift's priority the moment it was recorded, regarding of like priority the 1983 renewal and refinancing and any other indebtedness within the dragnet's reach, up until October of 1984. Shutze's point is that on October 23, 1984, he enrolled his judgment to the tune of some $4,541.78 plus interest and that, from and after that date, he held by law a lien on all of Gentry's property in the county. Miss. Code Ann. § 11-7-197 (1972). He argues further that his judgment lien is entitled to priority as of the date of enrollment, and in this he is correct. Miss. Code Ann. §§ 11-7-191 and 89-5-1, et seq. (1972). Credithrift does not dispute this. Indeed, our question is not which lien came first. All admit that the lien of Credithrift's April 8, 1981, deed of trust has priority over Shutze's October 23, 1984, judgment lien. Miss. Code Ann. § 89-5-5 (1972). Our question is the reach of Credithrift's lien and whether it extends to Credithrift's *60 1985 refinancing and future advances.
The former point is easy. Insofar as the 1985 secured transaction between Credithrift and the Gentrys represented a renewal of sums outstanding under their prior secured loans, Credithrift is entitled to priority. It would be anomalous indeed to hold that a secured creditor loses his priority position when he refinances a debt such as this. See Whiteway Finance, 434 So.2d at 1353; Holland v. Bank of Lucedale, 204 So.2d at 877. It is true Miss. Code Ann. § 89-5-21 (1972) requires one such as Credithrift to cancel its deed of trust upon its receipt of "full payment of the money due by the mortgage or deed of trust." Miss. Code Ann. § 89-1-49 (1972) is to like effect. The 1985 renewal no doubt "paid" the earlier note in a formalistic sense, but it was hardly "full payment" within the language of the deed of trust nor the statutory imperatives.[3]See Whiteway Finance, 434 So.2d at 1353. All agree Credithrift would prevail if, in 1983 and 1985, it had merely taken a new note incident to the renewal, refinancing or advance. Out of an abundance of precaution, Credithrift  while leaving the 1981 deed of trust uncancelled and unsatisfied  took new deeds of trust in 1983 and 1985. No sensible reason is offered why we should seize on this added security precaution and thereby render Credithrift less secure. Nor does Miss. Code Ann. § 89-5-19 (1972) embarrass what we say, as from the face of the record Shutze's April 8, 1981, note and the lien securing same, renewal or no, are alive and well.[4]
*61 The more difficult question concerns the 1985 future advance of $2,784.13.[5]Witczinski v. Everman, 51 Miss. 841, 846 (1876), though decided a good while back, speaks perceptively to the point.
A mortgage to secure future advances, which on its face gives information as to the extent and purpose of the contract, so that a purchaser or junior creditor may, by an inspection of the record, and by ordinary diligence and common prudence, ascertain the extent of the encumbrance, will prevail over the supervening claim of such purchaser or creditor as to all advances made by the mortgagee within the terms of such mortgage, whether made before or after the claim of such purchaser or creditor arose. [Emphasis supplied]
The Witczinski future advance clause was far less elaborate than Credithrift's but was nevertheless held
enough to show a contract that ... is to stand as security ... for such indebtedness as may arise from future dealings between the parties,
by reason of which the Court held it
sufficient to put a purchaser or encumbrancer on inquiry, ... .
Witczinski, 51 Miss. at 846.
This duty of inquiry beyond the face of the public record had been accepted earlier in Summers & Brannin v. A. Roos & Co., 42 Miss. 749, 780 (1869),[6] a case legally even more analogous to today's. Baggett, a common creditor like unto the pre-judgment Shutze, contracted with debtors after the deed of trust had been recorded and thereafter sued out an attachment, only to have the priority of his debts primed by future advances under the deed of trust.[7]
*62 Gray v. Helm, 60 Miss. 131, 141 (1882), reiterated the Witczinski rule, and a generation later Candler v. Cromwell, 101 Miss. 161, 57 So. 554 (1911), reinforced it in the context of an "open account" future advance clause far more ambiguous than that here and of facts legally analogous. The holder of a crop mortgage containing the "clause" had advanced some $87.00 after the competing creditor's judgment lien attached to the crops. The Court held for the mortgage holder, quoting at length from Witczinski.[8]Candler, 101 Miss. at 171-72, 57 So. at 556. See also, Baker v. Building & Loan Association of Jackson, 168 Miss. 808, 816, 152 So. 288, 290 (1934).
North v. J.W. McClintock, Inc., 208 Miss. 289, 44 So.2d 412 (1950), is a troublesome case. In September of 1947, McClintock made a real estate secured loan to Harper, the deed of trust containing a dragnet clause. Harper paid part of the debt, then in April of 1948, gave a new deed of trust to North to secure a new loan. North immediately recorded her deed of trust. Three weeks later Harper signed a new $650.00 note to McClintock. Upon Harper's default, McClintock and North got into a priority fight regarding McClintock's last advance. In a fact-sensitive opinion, this Court held the priority issue to turn on whether, at the time of his last advance to Harper, McClintock "had actual knowledge of the existence of the North deed of trust."[9]North, 208 Miss. at 301, 44 So.2d at 414. In an effort to sidestep Witczinski and progeny, North implies it matters whether the future advance was "obligatory" or "voluntary."[10]North, 208 Miss. at 299-300, 44 So.2d at 414. We find nothing in Witczinski or any of the following cases that makes anything turn on this distinction.
Nothing in North purports to overrule Witczinski and progeny. It does not so much as mention Candler. The Court makes a curious (and legally irrelevant) reference to its inability to find the Witczinski record. North, 208 Miss. at 300, 44 So.2d at 414. In a perceptive dissent, Justice Alexander takes the North Court to task for ignoring the rule settled in Witczinski and followed consistently for three quarters of a century.[11]
Whiteway Finance returns to first principles. Again, the question concerns the priority rights of a secured creditor making a future advance under a clause such as *63 that here at issue vis-a-vis a third party who has, prior to the advance, acquired perfected rights in the property. In Whiteway the creditor had made a loan to Percy Lee Green in 1974. The loan was secured by certain real property via a deed of trust which contained a dragnet clause providing that it would secure future advances. Less than two years later, Green conveyed the property by warranty deed to his father, Washington Green, Jr., and this warranty deed was lodged of record and in law became notice to the world. Miss. Code Ann. §§ 89-5-1 and -5 (1972). Five months later, Percy Lee Green refinanced the outstanding balance of the original 1974 loan and borrowed from Whiteway new money in the amount of $3,500.00.
To be sure, the conveyance from Percy Lee Green to his father smacks of fraud, though the opinion neither makes nor proceeds on any assumption thereof. What we regard as important is the Court's treatment of the future advance  the money Whiteway loaned Green after he had conveyed the property to his father and had placed the deed of conveyance of public record. As between Percy Lee Green and Whiteway, the Court, of course, held the future advance clause enforceable and that the original deed of trust secured the $3,500.00 in new money. The Court then in so many words says this $3,500.00 lien had priority over the rights of Washington Green, Jr., notwithstanding the latter's perfected rights via the recorded warranty deed.[12]Whiteway Finance, 434 So.2d at 1353.
The principle undergirding Whiteway is that, for priority purposes, the lien securing the future advance takes its date from the recording of the original deed of trust and by operation of law reaches forward to secure the advance made after intervening rights became perfected. The reason we permit this is the same we found in Witczinski and Summers & Brannin almost 120 years ago and in Candler a generation later. Third parties dealing with the debtor  Washington Green, Jr., in Whiteway, Thomas E. Shutze in today's case  are given notice by the public record that the recorded lien secures any future advances. Those third parties are charged at their peril to inquire of the debtor and prior secured creditors. Candler, 101 Miss. at 172, 57 So. at 556; Witczinski, 51 Miss. at 846; Summers & Brannin, 42 Miss. at 780. The device of a subordination agreement or notice to terminate[13] may be available but, failing some legally effective contract or notice rearranging rank, third parties cannot be heard to complain when the original secured creditor's future advances are accorded the priority its publicly recorded instrument imports.
Nothing said here turns on the fact that in 1985, at the time of its last advance to the Gentrys, Credithrift had no actual knowledge of Shutze's judgment nor the lien thereof. We quite agree with the point Shutze stresses on appeal, that the Circuit Court erred when it held Credithrift prevailed by reason of its lack of actual knowledge.[14] Shutze's enrolled judgment became notice to the world from and after October 23, 1984, and the fact that Credithrift did not know of it in no way affects Shutze's rights. Where Shutze fails is in his inability to see the Credithrift's lien was perfected three and a half years prior to his judgment lien and, by reason of the dragnet clause, Credithrift's lien reaches forward and secures the 1985 renewal and advance. Credithrift's dragnet clause had been a matter of public record since 1981, and under Witczinski and progeny would-be *64 creditors such as Shutze were charged with knowledge thereof and with a duty of diligent inquiry regarding further details, before doing business with Gentry whether on open account or otherwise.[15]
All of this makes perfectly good sense in today's world. Our citizens and their secured creditors need the flexibility dragnet clauses provide. The demands of our agricultural credit economy are as great as in the days of Witczinski and Summers & Brannin. Draws on construction loans and disbursements under lines of credit are other common examples of future advances businessmen need and secured lenders make. Second mortgage home equity loans are a more recent area of need. Many Mississippians need to borrow substantial sums with which to educate their offspring and to borrow by the semester as tuition payments become due. They and their lenders need the security of the knowledge that their priority position will remain fixed to the date of the original deed of trust or security agreement, so that they can save "time, travel, loan closing costs, costs of extra legal services, recording fees, et cetera," as in Newton County Bank v. Jones, 299 So.2d at 218. There is no reason our law should demand new title searches incident to each advance. Any other view could imperil the student's education in mid-stream. The same may be said for opportunities our citizens pursue and in many other areas of social and economic life. The public records system each county maintains affords third parties full opportunity for knowledge which, if pursued with diligence, protects such third parties from being blind-sided.[16] And because they will know we mean what we say, creditors do not have to record a new deed of trust every time a future advance is made which, if nothing else, avoids cluttering up the land records.

B.
There is another dimension. The Uniform Commercial Code as originally enacted in Mississippi treated the priority of liens securing future advances the same as our cases noted above. Miss. Laws, ch. 316, §§ 9-301, etc. (1966).[17] Effective July 1, 1986, we amended our law to limit the lien's priority (though not its enforceability) to future advances made within forty-five days of perfection of an intervening lien or without actual knowledge of the new lien. Miss. Code Ann. § 75-9-301(4) (Supp. 1991).[18] This enactment does not directly reach real estate secured transactions. Miss. Code Ann. § 75-9-102(1) and -104(j) (1972). It does, however, pronounce the public policy in an area on its face indistinguishable in principle from real estate secured transactions. Dragnet clauses legally identical to Credithrift's abound in personal property security agreements across this state. We perceive no good reason why this legal language should have one meaning and effect where the security is personalty and an altogether different *65 meaning and effect where the security is realty. Cf. Wansley v. First National Bank of Vicksburg, 566 So.2d 1218, 1224-25 (Miss. 1990) (by analogy, applying Mississippi UCC Section 75-9-504(3) to real estate mortgage foreclosure); Hughes v. Tyler, 485 So.2d 1026, 1029, 1033-34 (Miss. 1986) (holding Mississippi UCC Section 75-3-606 applicable to assumption of a mortgage loan). We sharpen the point when we see dragnet clauses in mixed security agreements, where the collateral is a combination of real and personal property and a single dragnet clause says all collateral stands to secure all future advances.[19]
If we imported Section 75-9-301(4) into our law of real estate secured transactions, we would cut back the reach of the dragnet clause. We need not take that step today, for Credithrift prevails even under the UCC. The Chancery Court found as a fact that, at the time of its 1985 refinancing and advance, Credithrift "had no actual notice of ... [Shutze's] judgment," suggesting perhaps the language in North v. J.W. McClintock, Inc., 208 Miss. at 209-301, 44 So.2d at 414, is after all not so far from the mark. The point for the moment is, given the findings of fact, Credithrift prevails even under amended Section 75-9-301(4), if we enforced it by analogy.[20]

V.
Alternatively, Shutze argues, even if his judgment lien is wholly junior and subordinate to Credithrift's rights, the value of the collateral was nevertheless such that he should be paid in full.
The record reflects that in April of 1981, the Gentrys' 34th Avenue residence was appraised at $76,500.00. Apparently, prior to foreclosure, Credithrift engaged Homeland Titles Company to do a "quick sales appraisal"  an appraisal that contemplated having to sell the house within ninety days. The quick sales appraisal of the Gentrys' property was $60,000.00. Credithrift bought the property at foreclosure for $10,739.65. Because it bought subject to Deposit Guaranty's first mortgage indebtedness  $37,145.00 at the time  Credithrift in effect paid $47,884.00 for the property. Given these figures, one can readily see that, even if we accept the quick sales appraisal, there has been an equity left in the home from (the proceeds of) which Shutze's judgment might be satisfied.
Of course, none of this is sufficient to void the foreclosure, and a valid and effective foreclosure extinguishes all subordinate rights. The foreclosing trustee
has the exact same power to convey free and clear of junior liens or interests as though he held a deed absolute filed for record the day the deed of trust was recorded.
People's Bank and Trust Co. v. L & T. Developers, Inc., 434 So.2d 699, 708 (Miss. 1983). Our long-standing rule is that a foreclosure sale will not be set aside unless the sales price is so inadequate as to shock the conscience or to amount to a fraud. Wansley v. First National Bank of Vicksburg, 566 So.2d 1218, 1224 (Miss. 1990); Central Financial Services, Inc. v. Spears, 425 So.2d 403, 405 (Miss. 1983). We are not here so shocked.
We have emphasized that

*66 this rule concerns only the legality of the foreclosure sale for purposes of vesting title to the collateral in the creditor or other purchaser at foreclosure. It has nothing whatsoever to do with the separate and distinct question of what, if any, deficiency judgment may be allowed.
Wansley, 566 So.2d at 1224. Nor, as here, does it have to do with the separate and distinct rights of junior creditors who follow the proceeds of the sale and assert equitable claims. For purposes of deficiency judgment against the debtors, our cases have long recognized that the terms of foreclosure or other dispositions must be commercially reasonable and that, particularly where the foreclosing creditor buys at foreclosure, it must give the debtor fair credit for the commercially reasonable value of the collateral. Wansley, 566 So.2d at 1221-22, 1224-25. The same principle protects the rights of a junior lien creditor such as Thomas E. Shutze. Builders Supply Company of Hattiesburg v. Pine Belt Savings & Loan Assoc., 369 So.2d 743 (Miss. 1979).
Shutze initiated this proceeding in the Chancery Court and asked inter alia that the Court adjudge "all of the rights and interests of the parties... ." Shutze asked further "for such other relief to which he may be entitled." In the present context, we find this sufficient to place before the Court the matter of Shutze's rights in the "equity" in the 34th Avenue property. Unfortunately, in the Court below these rights were not finally adjudged. The Chancery Court made no finding of fact of the value of the property at the time of foreclosure or at any other time. We have before us hearsay opinion evidence that in 1981 the property had a fair market value of $76,500.00. We have further hearsay evidence that at the time of foreclosure, the property had a quick sale value of $60,000.00. Nothing before us shows whether Credithrift has disposed of the property for a profit or a loss, nor whether such disposition may have been commercially reasonable, nor, for that matter, do we know whether Credithrift has disposed of the property at all.
All of this leaves us with the firm and definite conviction that there is unfinished business below. We remand this case to the Chancery Court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REMANDED IN PART FOR FURTHER PROCEEDINGS.
ROY NOBLE LEE, C.J., and PRATHER, SULLIVAN and BANKS, JJ., concur.
HAWKINS, P.J., dissents with written opinion, joined by DAN M. LEE, P.J., in results only.
DAN M. LEE, P.J., dissents with separate opinion joined by HAWKINS, P.J., and PITTMAN and McRAE, JJ.
HAWKINS, Presiding Justice, dissenting:
I join Justice D. Lee's dissent for the further reason that Miss. Code Ann. § 89-5-19 (1972) compels reversal.[1]
On April 8, 1981, Mr. and Mrs. Gentry executed a deed of trust in favor of Credithrift to secure an indebtedness "in the full amount of $23,679.76, as evidenced by a promissory note of even date herewith in favor of the beneficiary ... and being due *67 and payable as follows, to-wit: Terms: 72 payments of $328.88 each."
The deed of trust does not give the due date of any of the installments under the promissory note.
In checking titles the attorney always looks, as to any deed of trust not marked satisfied of public record, at the date of the deed of trust, and the due date of the final installment of the note secured by the deed of trust. If more than six years has transpired from the due date of the final installment of the note secured by the deed of trust, the deed of trust is barred. Assuming the note on its face is barred, the title attorney has no obligation to go to the creditor bank and see if there is some other indebtedness under that deed of trust which has not been paid.
If the note secured by the deed of trust shows on its face that it is barred, the attorney advises his client that he can make a loan and have a first mortgage.
There is a very easy way for a creditor who has made advances which have not been paid, and/or some of the note secured by the deed of trust remains due and the six-year statute of limitations is about to expire. What does he do? He makes a new note and a new deed of trust encompassing all current indebtedness, and puts on the face of the new deed of trust that it is in renewal and extension of the old deed of trust dated ____, and recorded ____. As an additional precaution, he or the debtor can also put on the margin of the old deed of trust that it is being extended and renewed.
In this way everybody is protected, nobody is hurt, and this is precisely what Miss. Code Ann. § 89-5-19 is all about.
Miss. Code Ann. § 89-5-19, clearly provides that when the statute of limitations has run from the date of the last installment on the note secured by the deed of trust as it appears on the public record (not the way the note may actually read), then it is all over. This is the way this Court has construed the statute. Lampton-Reid Co. v. Allen, 177 Miss. 698, 712, 171 So. 780, 782 (1937); Musser v. First Nat'l Bank v. Corinth, 165 Miss. 873, 882, 147 So. 783, 784 (1933).
If the bank wants to prevent this, then it can enter on the margin of the deed of trust within six months after the remedy has been barred that the deed of trust is being renewed, or make out a new deed of trust NOTING THE FACT OF RENEWAL OR EXTENSION and file it of public record. If the creditor bank does not do this, it loses its place in priority.
Miss. Code Ann. § 89-5-19 tells you something else:
If the date of final maturity of such indebtedness so secured cannot be ascertained from the face of the record, the same shall be deemed to be due one year from the date of the instrument securing the same for the purpose of this section.
Because Credithrift did not see fit to enlighten the public as to the due date or final maturity of the promissory note for which this deed of trust was executed, the six-year statute began to run April 8, 1982, one year from date of the deed of trust. Six years expired April 7, 1988.
The complaint to establish its lien was filed July 15, 1988. At that time Credithrift had no lien under its 1981 deed of trust.
DAN LEE, P.J., concurs in result only.
DAN M. LEE, Presiding Justice, dissenting:
Today's majority would allow a lending institution to foreclose through the use of a "dragnet" (future advance) clause in a prior deed of trust which had been extinguished by operation of law, Miss. Code Ann. § 89-1-49 (1972). The unfortunate result in today's case allows the circumvention of a validly enrolled judgment lien. I therefore feel compelled to dissent.
I am also concerned about the effect the majority opinion will have upon the law and upon the people who check land titles in this state. It is disturbing to think that henceforth one might not be able to check a land title by examining all pertinent records at the county courthouse. Today's majority would cast a shadow of doubt *68 upon a client's lien position and upon an attorney's ability to certify titles with any degree of certainty.
By clear language, Miss. Code Ann. § 89-1-49 provides that when a debt secured by a deed of trust is paid, the deed of trust is ipso facto extinguished. This certainty regarding the status of a land title is crucial in our global financial world, where debts and securities are often transferred to out-of-state lenders.
In today's case, the following significant events, in chronological order, transpired:

 CHRONOLOGICAL CALENDAR OF EVENTS
DATE EVENT
----------------------------------------------------------------------------
April 7, 1978
 Gentrys purchased Lot 53, Rosewood Heights Subdivision,
 and house thereupon. First deed of trust, to Deposit
 Guaranty Mortgage Company, was signed and duly recorded
 in land records. This transaction is not involved in
 today's dispute.
April 8, 1981
 First Credithrift Loan: Gentrys borrowed money
 ($23,679.36) from Credithrift; This second deed of
 trust (containing a dragnet clause) was signed in favor
 of Credithrift, and was duly recorded in the land
 records on April 8, 1981.
July 12, 1983
 Second Credithrift Loan: A second loan, for $14,150.26,
 was made by Credithrift to the Gentrys, and the Gentrys
 signed a new note and deed of trust, which was likewise
 duly filed and recorded. Credithrift used the proceeds
 from the new loan to pay off the entirety of the 1981
 note secured by the 1981 deed of trust and returned the
 cancelled 1981 note to the Gentrys. (By operation of §
 89-1-49, "payment of the money secured by any mortgage
 or deed of trust shall extinguish it, and revest the
 title in the mortgagor as effectually as if reconveyed,"
 so at this time the first (1981) Credithrift deed
 of trust was extinguished, see § 89-1-49, and all
 actions on the 1981 deed of trust were barred. §
 89-5-21.)
September 20, 1984
 Valid judgment rendered against Gentrys and in favor of
 appellant Thomas E. Shutze for $4,541.78.
October 23, 1984
 Shutze properly entered his judgment lien against
 Gentrys' property on the Judgment Roll.
 Summer of 1985 
 Home-land Title Co. performed title examination prior
 to Credithrift making its third loan to the Gentrys.
 Home-land Title Co. failed to discover the 1984 Shutze
 judgment lien, which had been enrolled October 23,
 1984.
August, 1985
 Third Credithrift Loan: Credithrift made a new loan
 (for $14,150.26) to the Gentrys. Proceeds from the new
 loan were used to pay off the 1983 note completely.
 The 1983 note was cancelled and returned to the Gentrys.
 (Thus the 1983 deed of trust was completely extinguished
 and title revested in the Gentrys as effectually as if
 reconveyed, see § 89-1-49.) The Gentrys executed a
 new deed of trust in favor of Credithrift, which was
 duly recorded in August of 1985. (This new deed of trust
 ranked behind the 1984 Shutze judgment lien by
 operation of § 89-5-1, because the 1984 Shutze
 judgment lien was enrolled prior in time to the
 recording of the 1985 deed of trust.)
Early 1988
 Gentrys moved to California and defaulted on August,
 1985, Credithrift loan. Credithrift discovered the
 intervening 1984 Shutze

*69
 judgment lien enrolled on Judgment Roll and attempted to
 substitute trustees under 1981 deed of trust, which had
 already been extinguished, instead of acting under its
 1985 deed of trust.
July 12, 1988
 Credithrift foreclosed on the 1981 deed of trust,
 assuming that it had such authority under the dragnet
 clause of the 1981 (extinguished) deed of trust;
 Credithrift purchased Gentry house at foreclosure sale
 for $10,739.65, which was the amount the Gentrys owed on
 their 1985 note. Credithrift refused to recognize the
 1984 Shutze judgment lien, and instead claimed it had
 priority by virtue of the dragnet clause in the 1981
 deed of trust.

PRIORITY OF LIENS CONTROLLED BY STATUTE
The majority contends that the 1985 loan by Credithrift, consisting of a new note and deed of trust, could be considered an advance under the 1981 deed of trust. This contention is not persuasive because the granting of the new loan in 1985, and the recording of a new deed of trust to secure the loan, by operation of law cancelled and extinguished the 1981 and 1983 deeds of trust, including the dragnet clauses therein contained; indeed, all rights thereunder were barred by operation of law.
Mississippi has a wealth of statutes pertaining to the issues in this action, and such statutes dictate the result we must reach. One such statute provides:
§ 89-1-49. Payment extinguishes mortgage.

Payment of the money secured by any mortgage or deed of trust shall extinguish it, and revest the title in the mortgagor as effectually as if reconveyed; except, however, that this section shall have no application to security agreements executed under the Mississippi Uniform Commercial Code nor to security interests created by such security agreements.
SOURCES: Codes, 1880, § 1207; 1892, § 2452; 1906, § 2782; Hemingway's 1917, § 2286; 1930, § 2152; 1942, § 873; Laws, 1968, ch. 495, § 1, eff. from and after March 31, 1968.
Miss. Code Ann. § 89-1-49 (Supp. 1991) (emphasis supplied).
By the clear language of this statute, when the Gentrys paid off their 1981 loan by taking out a new loan in 1983, the 1981 deed of trust, including its dragnet clause, was extinguished as a matter of law, as effectually as if the property had been reconveyed. Again in 1985, when the Gentrys paid off their 1983 loan by taking out a new loan, the 1983 deed of trust, including its dragnet clause, was extinguished, as effectually as if the property had been reconveyed.
Thus, by operation of law, the 1981 and 1983 deeds of trust were no longer in existence, having been completely extinguished at the time the loan each secured was paid off; therefore dragnet clauses in either of the two previous deeds of trust were likewise extinguished.
The next pertinent statute provides:
§ 89-5-21. Satisfaction to be entered on the record.
Any mortgagee or cestui que trust, or assignee of any mortgagee or cestui que trust, of real or personal estate, having received full payment of the money due by the mortgage or deed of trust, shall enter satisfaction upon the margin of the record of the mortgage or deed of trust, which entry shall be attested by the clerk of the chancery court and discharge and release the same, and shall bar all actions or suits brought thereon, and the title shall thereby revest in the grantor. And if such mortgagee or cestui que trust, or such assignee, by himself or his attorney, shall not, within one month after request, cancel on the record the said mortgage or deed of trust the beneficiary shall forfeit the sum of fifty dollars, which can be recovered by suit on the part of the party *70 aggrieved, and if after request, he fails or refuses to make such acknowledgment of satisfaction, the person so neglecting or refusing shall forfeit and pay to the party aggrieved any sum not exceeding the mortgage money, to be recovered by action; but such entry of satisfaction may be made by anyone authorized to do it by the written authorization of the mortgagee or beneficiary, duly acknowledged and recorded, and shall have the same effect as if done by the mortgagee or beneficiary.
SOURCES: Codes, Hutchinson's 1848, ch. 42, art. 1 (33, 34); 1857, ch. 36, art. 14; 1871, § 2297; 1880, § 1206; 1892, § 2451; 1906, § 2781; Hemingway's 1917, § 2285; 1930, § 2155; 1942, § 876; Laws, 1948, ch. 233, § 1.
Miss. Code Ann. § 89-5-21 (Supp. 1991) (emphasis supplied).
Thus the position Credithrift urges today was completely barred, and the title to the property revested in the Gentrys, the grantors, as a matter of law. Section 89-1-49 is self-executing, and § 89-5-21 further states that all actions are barred thereon, and provides for forfeiture against Credithrift for failure to cancel.
It is elementary that a judgment duly obtained and timely recorded shall be a lien upon all property of the Gentrys within the county where so enrolled, from the date of rendition thereof, and shall have priority according to the order of such enrollment, as provided for by statute:
§ 11-7-191. Lien of enrolled judgment.
A judgment so enrolled shall be a lien upon and bind all the property of the defendant within the county where so enrolled, from the rendition thereof, and shall have priority according to the order of such enrollment, in favor of the judgment creditor, his representatives or assigns, against the judgment debtor and all persons claiming the property under him after the rendition of the judgment ...
Miss. Code Ann. § 11-7-191 (Supp. 1991) (emphasis supplied).
Thus the chancellor erred when he held that the dragnet clause in the 1981 deed of trust was effective when in fact it had been completely extinguished by operation of law, Miss. Code Ann. § 89-1-49 (Supp. 1991).

DRAGNET CLAUSE
Each of the three deeds of trust (1981, 1983, and 1985) contained a future advance, or "dragnet," clause. This clause comprised the fourth paragraph on the second page of each deed of trust. Each dragnet clause appeared in small, agate-sized print. There were 20 paragraphs of conditions included in each three-page deed of trust document.
By its own terms this dragnet clause was "optional" rather than "obligatory" because Credithrift, the beneficiary, was to be the sole determiner of whether or not future advances would be made.
The dragnet clause appeared as follows:
[I]n addition to the indebtedness specifically mentioned above, and any and all extensions or renewals of the same, or any part thereof, this conveyance shall also cover such future and additional advances as may be made to the grantor, or either of them, by the beneficiary, the beneficiary to be the sole judge as to whether or not such extensions or renewals, future and additional advances shall be made. In addition to all of the above, it is intended that this conveyance shall secure, and it does secure any and all debts, obligations, or liabilities, direct or contingent, of the grantor herein, or either of them, to the beneficiary, whether now existing or hereafter arising at any time before actual cancellation of this instrument on the public records of mortgages and deeds of trust, whether the same be evidenced by note, open account, over-draft, endorsement, guaranty, or otherwise.

OPTIONAL VS. OBLIGATORY ADVANCES
In situations different from the one we face today, but where a prior deed of trust which still secures an unpaid debt remains uncancelled, the distinction between optional and obligatory advance clauses *71 can determine the outcome, insofar as the interests of lienholders who may have acquired an interest in the land are concerned. An obligatory advance is one which the lender (beneficiary) is bound by contract to make at a later date. However, an optional advance clause is a horse of a different color; the lender (beneficiary) has the discretion to determine at a later date if he wishes to lend more money to the borrower (grantor), and is not bound by contract to make any additional loans. One leading authority has described the difference between optional and obligatory advances as follows:
So far as enforcement between the parties is concerned, the obligatory-optional distinction is irrelevant. Even if the advance is clearly optional, its acceptance by the mortgagor signifies his willingness to have it included in the mortgage. However, when a subsequent third-party creditor enters the picture, it becomes critically important to determine whether the advance is obligatory or not. The rule widely followed in the United States is this: if the advance is obligatory, it takes its priority from the date of the original mortgage, and the subsequent creditor is junior to it ... However, if the advance is optional, and if the mortgagee has notice when the advance is made that a subsequent mortgagee or lienor has acquired an interest in the land, then the advance loses its priority to that creditor.

S. Nelson & D. Whitman, Real Estate Finance Law 885-86 (2nd Ed. 1985) (footnotes omitted).
There are good reasons for making this distinction between obligatory and optional advances, as explained by this same authority:
Dragnet clauses are frequently included in the printed language of mortgages drafted by mortgagees. They are seldom the subject of negotiation, and may go entirely unnoticed by the mortgagor until the mortgagee asserts them. The rule making optional advances subordinate to intervening liens is highly relevant in this context. Advances secured by dragnet clauses are almost never obligatory; the only factual issue is generally whether the mortgagee had the requisite notice of intervening liens, and this is usually not hard to determine. Moreover the rule . .. makes rather good sense in the dragnet clause case; in its absence, a mortgagor might naively execute upon his house a mortgage containing a dragnet clause and subsequently find himself locked to that particular lender for the rest of his life.
Id. at 899 (citations omitted).
Regarding the distinction between optional and obligatory future advance clauses, other authorities are in agreement, notwithstanding the comment of Professor Gilmore[1] to the contrary.
If the limit (in a dragnet clause regarding future advances) be not defined in any way, it can be good only for the advances made at the time, and such others as may afterward be made before any other incumbrances are made upon the property mortgaged. A mortgage *72 which merely declares that it is to secure such advances as shall thereafter be made by the mortgagee to the mortgagor, or such indebtedness as shall thereafter arise between them, should, it would seem, be held invalid either as against the policy of the law or as constituting evidence of fraud.
1 Jones on Mortgages § 458 (1928) (footnotes omitted).

ERRONEOUS ASSUMPTION MADE
The majority makes several arguments which do not apply to the case at bar. First, the majority makes this mistaken assumption: "it is apparent Credithrift regarded the refinancing of July, 1983, as a `renewal of the [original] indebtedness' pursuant to the dragnet clause of the April 8, 1981, deed of trust." Later, regarding the 1985 deed of trust, it is stated: "Credithrift again regarded the renewal and advance as within the dragnet clause of the 1981 deed of trust which it in no way cancelled or released, although it did take the precaution of a new deed of trust."
The record does not indicate that Credithrift regarded its refinancing as renewals of prior deeds of trust; indeed, the record indicates that Credithrift thought just the opposite, that each time the Gentrys borrowed new money, they were required to pay off their prior note, to sign a new note and deed of trust in favor of Credithrift, and each new deed of trust was duly recorded.
Richard D. Scott, manager of Credithrift, appeared as the only witness in the trial below. On cross-examination by Shutze's attorney, Scott testified:
Q: Would you ever close a loan, say if you had a judgment on the Judgment Roll, and you knew it was there, would you close the loan anyway?
A: (by Scott:) No.
Transcript, vol. 2, p. 11.
This testimony demonstrates that the parties regarded the 1981 and 1983 deeds of trust as extinguished and cancelled. If the 1985 loan had been secured by the 1981 deed of trust, Manager Scott would have had no reason to let the 1984 Shutze lien prevent him from making a new loan to the Gentrys.
But even if, for the sake of argument, the 1981 note securing the 1981 deed of trust had not been paid, and if the 1983 and 1985 loans had been made, Shutze would still prevail (1) because the dragnet clause in the 1981 deed of trust was "optional" rather than "obligatory;" and (2) because of the intentions of the parties regarding the 1981 dragnet clause.
A dragnet clause should not be given effect if it does not appear that the debt's inclusion in a deed of trust was intended or contemplated by the parties ... (T)he most important element for a Court to determine is: "What was the intention of the parties when they executed these various instruments?" Matter of Ladner, 50 B.R. 85, 91 (Bankr.S.D.Miss. 1985); Mohler v. Buena Vista Bank & Trust Co., 42 Colo. App. 4, 588 P.2d 894 (1978); United States v. American National Bank, 255 F.2d 504 (5th Cir.1958), cert. denied, 358 U.S. 835, 79 S.Ct. 58, 3 L.Ed.2d 72, rehearing denied, 359 U.S. 1006, 79 S.Ct. 1135, 3 L.Ed.2d 1034.
It is elementary that we will construe a dragnet clause most strongly against the drafter/lender. Trapp v. Tidwell, 418 So.2d 786, 792 (Miss. 1982), citing Williams v. Life Ins. Co. of Georgia, 367 So.2d 922 (Miss. 1979).
The 1983 and 1985 deeds of trust made no references or other attempts to relate back to, as renewals of, or as future advances under, the 1981 deed of trust. This further evidences the fact that Credithrift regarded the prior deeds of trust as being cancelled upon payment of the underlying debts in 1983 and 1985.

U.C.C. DOES NOT CONTROL
The majority states: "We perceive no good reason why this legal language should have one meaning and effect where the security is personalty and an altogether different meaning and effect where the security is realty."
The legislature in its wisdom, and for its own reasons, chose to treat real property in *73 one way and personal property in another. It is not our task to decide the wisdom of the legislature, only to interpret its laws. Marbury v. Madison, 1 Cranch (5 U.S.) 137, 170, 2 L.Ed. 60 (1801).
§ 89-1-49 states unambiguously: "[T]his section shall have no application to security agreements executed under the Mississippi Uniform Commercial Code nor to security interests created by such security agreements." In the Mississippi version of the U.C.C. we find the following:
§ 75-9-102. Policy and scope of chapter.
(1) Except as otherwise provided in section 75-9-104 on excluded transactions, this chapter applies
(a) to any transaction (regardless of form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts ...
Miss. Code Ann. § 75-9-102 (Supp. 1991) (emphasis supplied).
There are no Mississippi cases annotated under the Mississippi Code version of the U.C.C. (Supp. 1991), but a Connecticut case is cited for the proposition that Article 9 of the U.C.C. applies only to the creation of security interests in personal property or fixtures, and is not applicable to the creation of a real estate mortgage. State Nat. Bank v. Dick, 164 Conn. 523, 325 A.2d 235 (1973).
Proceeding through the Mississippi version of the U.C.C. we find that Article 9 of the U.C.C. "does not apply: (j) ... to the creation or transfer of an interest in or lien on real estate ..." Miss. Code Ann. § 75-9-104 (Supp. 1991) (emphasis supplied).
By its own definitions and terms, Article 9 of the U.C.C. excludes real property from its coverage. Section 89-1-49, our statute dealing with the extinguishment of real property mortgages upon payment, specifically exempts U.C.C. personal property security agreements from its coverage. It is not for this Court to change the law by judicial fiat, and this I would decline to do today.

LAW HAS CHANGED
Notwithstanding the fact that the prior Gentry deeds of trust were extinguished by operation of law, the majority would have us return to ancient Mississippi case law and breathe life into a decision that was long ago overruled. If this were to be allowed, Credithrift and others neglecting to do business properly under the laws of our state would be rewarded, and those who properly check land and judgment records may well have wasted their time and money.
In justification for this, the majority states:
It is true that Miss. Code Ann. § 89-5-21 (1972) requires one such as Credithrift to cancel its deed of trust upon its receipt of "full payment of the money due by the mortgage or deed of trust." The 1985 renewal no doubt "paid" the earlier note in a formalistic sense, but it was hardly "full payment" within the language of the deed of trust nor the imperatives of § 89-5-21. See Whiteway Finance, 434 So.2d at 1353.
Again I beg to differ. Credithrift prepared all of the instruments and was in complete control of all aspects of the transactions in question, "formalistic" or otherwise. Credithrift was in control of whether the new loans were renewals of prior debts or new transactions. Credithrift chose to structure these transactions in such a manner as to exchange the old notes for new ones. Credithrift chose to receive and record a new deed of trust after each transaction. Credithrift could have made renewals of the old loans, instead of structuring the transactions as it did. These are exactly the types of transactions §§ 89-1-49 and 89-5-21 were designed to prevent from occurring.
The majority makes much ado about citations to old cases. I see no problem with citations to cases decided long ago, as long as the cases are still good law. However, such is not the case today, as the majority puts great weight upon a case which was overruled in 1949.
*74 The case in question is Witczinski v. Everman, 51 Miss. 841 (1876), which held that optional future advance clauses will be enforced over the rights of later lien creditors. Of course, this rule was never applied when the prior deed of trust had been extinguished by payment in full of the underlying debt. Witczinski is easily distinguished from the case at bar because Witczinski dealt with a debt which was still owing at the moment the third party became involved.
However, the law as defined and interpreted by our courts is ever fluid and is constantly changing to meet the needs of new generations of citizens and to adapt to modern behavior and business practices. Witczinski was overruled in 1949 by North v. J.W. McClintock, Inc., wherein we find the following:
As to the applicable law, it is said in 36 Am.Jur. p. 808, Par. 234, "The greater array of authority, however, is found on the side of the doctrine that advances made after notice of subsequent interests do not have priority over such interests." The rule is re-announced in 45 Am.Jur. p. 473, Par. 96. The rule is stated in 59 C.J.S., Mortgages, Section 230, page 299, in this language: "In accordance with the general rule, after notice of the attaching of a junior lien, the senior mortgagee ordinarily will not be protected in making further advances under his mortgage given to secure such advances, at least, where he was under no binding engagement to make such advances." These pronouncements have reference to actual notice. Neither Gray v. Helm, 60 Miss. 131, nor Liberty Mercantile Co. v. Allen, 134 Miss. 354, 98 So. 774, announces a different rule. In both cases the mortgage contract obligated the mortgagees to make future advances. However, in the case at bar the provision for advances was a blanket provision. It in no way bound the mortgagee to advance further money. Such advancement was purely optional with McClintock.... Neither party had it in mind... . We think the announced rule is just and equitable. The only amount named in the McClintock trust deed was $500.00. McClintock was not obligated to advance any more. If he then had actual knowledge Harper had given another a trust deed on the same property, he should have declined to make further advances, but having done so, his security became second to the lien he knew was on the mortgaged property. We adopt the stated rule as being equitable and just. It is uncertain from the report of the case of Witczinski v. Everman, 51 Miss. 841, whether it announces a different rule than the one here adopted. We have been unable to find the original record.
North v. J.W. McClintock, Inc., 208 Miss. 289, 299-300, 44 So.2d 412 (1949).
Furthermore, lest there be any doubt, Justice Alexander, the dissenter in North, stated:
The majority opinion adopts a rule which concededly is not unjust and which is in line with the majority of the courts. The trouble here is that it is out of accord with Witczinski v. Everman, 51 Miss. 841.
* * * * * *
If the Court desires to adopt the rule announced, it seems to me that there should be a forthright overruling of the Witczinski case. I would, therefore, be in a position to concur in the result reached were it not for my conviction that it involves a departure from our former decision upon the subject, and since I do not believe that the Witczinski case ought to be overruled, but that this has at least impliedly been done, I cannot consistently join in the majority opinion.
North, 208 Miss. at 301-02, 44 So.2d 412 (Alexander, J., dissenting) (emphasis supplied).
Whiteway Finance Co. v. Green, 434 So.2d 1351 (Miss. 1983) is trumpeted by the majority as demonstrating that this court has returned to the Witczinski principles which North had overruled. Nowhere in Whiteway is Witczinski even mentioned. Whiteway may be distinguished on its facts, for it involved a scenario far different *75 from Witczinski and different from the case at bar.
In Whiteway, the debtor obtained a loan which he secured with a deed of trust containing a dragnet clause. He then conveyed the property to his father. While concealing the fact that he no longer owned an interest in the personal property, the debtor "flipped" the original loan, paying off the old note and signing a new deed of trust on the same property. It is easy to understand how this court could decide that the finance company, and not the debtor's father, should enjoy priority in such circumstances, for the equities undoubtedly favored the lender on that day.
The facts are significantly different in the case sub judice. The equities would favor Shutze, who spent his own time and money to obtain a valid judgment against the Gentrys, and then to enroll it properly at the county courthouse. Whiteway is in no way analogous to the case at bar, because the debtor in Whiteway actively defrauded the lender when he secured his second loan and signed a deed of trust on property he had previously conveyed to his father. There is nothing in the record before us that would indicate that Shutze in any way attempted to mislead or defraud anyone, nor is there any indication that the Gentrys misrepresented to Credithrift the fact that a judgment lien had been enrolled upon their property between the time of the 1983 loan and the 1985 loan.

ACTUAL NOTICE OF JUDGMENT LIEN
The lower court found that Credithrift had "no actual notice" of the Shutze judgment, and weighed this in Credithrift's favor. Again, we believe the chancellor below erred in so finding.
It is firmly etched into Mississippi jurisprudence that since the recording of the judgment lien was "notice to the world," Credithrift was deemed to be on notice of the Shutze lien, and ignored such lien at its own peril, notwithstanding the failure of the title company to discover the lien. Simmons v. Hutchinson, 81 Miss. 351, 356-57, 33 So. 21, 22 (1902).
Credithrift paid Home-land Title to search the record before executing the 1985 loan to the Gentrys. The title company failed to discover the Shutze lien on the judgment roll, where it had been properly enrolled by Shutze. The chancellor took the position that since Home-land, acting for Credithrift, failed to discover the Shutze judgment lien, and therefore Credithrift had no actual notice thereof, this failure should excuse Credithrift from being subject to the Shutze judgment lien. This is directly contrary to our statute:
A judgment so enrolled shall be a lien upon and bind all the property of the defendant within the county where so enrolled ... and shall have priority according to the order of such enrollment....
Miss. Code Ann. § 11-7-191 (Supp. 1991) (emphasis supplied).
Thus the chancellor erred as a matter of law. This requires reversal. To affirm the chancellor would be to destroy Shutze's judgment lien position, which is secured to him by clear statutory mandate.
Before the execution of the 1985 loan, Credithrift had a prior in time, and therefore superior, lien to Shutze because Credithrift's 1983 deed of trust was entered into the public record prior in time to the 1984 Shutze judgment lien. Miss. Code Ann. §§ 11-7-191 ("A judgment ... shall have priority according to the order of such enrollment"); 89-5-1 ("priority of time of filing shall determine the priority of all conveyances of the same land"); 89-5-3 ("priority thereof shall be governed by the priority in time of filing"); 89-5-5 ("priority thereof shall be governed by the priority in time of the filing").
The 1985 deed of trust was valid, but since it was enrolled later in time, the 1985 deed of trust was therefore subject to, and junior to, Shutze's 1984 judgment lien as a matter of law. Miss. Code Ann. §§ 11-7-191, 89-5-1, and 89-5-5 (Supp. 1991). Therefore the 1985 transaction is by nine months a junior lien and is subject to Shutze's 1984 judgment lien, which was duly enrolled.
*76 When the 1981 and 1983 debts were paid off, the 1981 and 1983 deeds of trust became completely extinguished and inoperative because they secured nothing. Therefore all rights or actions thereunder were barred by statute.
I would reverse and enter judgment here for the appellant on the issue of the priority of the Shutze lien, but remand to the chancery court of Forrest County, Mississippi, for such further and necessary proceedings consistent with this opinion. Accordingly I respectfully dissent.
HAWKINS, P.J., and PITTMAN and McRAE, JJ., join this dissent.
NOTES
[1] The term "dragnet clause" connotes breadth of reach and is thought something much more than a conventional future advance clause. Future advances are one sort of debt included within dragnet clauses. All such clauses are enforced by reference to their language and law and not their label.
[2] In today's technical legal parlance, Credithrift's interest in the 34th Avenue property is a "security interest," not a "lien." See Restatement of the Law (Third), Property-Security (Mortgages) (Tent. Dr. No. 1, March 22, 1991), and § 4.1(a) (Tent. Dr. No. 2, March 25, 1992); see also, Miss. Code Ann. § 75-1-201(37) (Supp. 1991); and South Mississippi Finance Company v. Mississippi State Tax Commission, 605 So.2d 736, 738 fn. 1 (Miss. 1992).
[3] In dissent Presiding Justice Dan Lee argues "payment." He cites no authority, as there is none. Nor does Shutze mention the point. To be sure, the 1981 note was "paid" by the 1983 note, which in turn was "paid" by the 1985 note. None of this discharged the 1981 deed of trust. Each of these new notes represented a "renewal" and/or "future or additional advance" within and secured by the 1981 deed of trust. Any other view would be unfortunate. Oftentimes debtors and secured creditors have bona fide need of refinancing, not to mention future advances. Under the view advanced in the dissent, any secured party entered into such a refinancing would thereby forfeit the effective date and priority of its security interest. It would require needless and expensive title searches. This, of course, would sharply curtail a debtor's ability to refinance.

We reject the dissent theory in its entirety, but, if we were inclined to credit it so far as its logic may suggest, we would still affirm. Indulging a heavy dose of formalism, we see that Gentry's July 12, 1983, debt was incurred before his April 8, 1981, note was "paid." On July 12, 1983, in a technical sense, Credithrift loaned Gentry $14,150.26 which he only then used to pay the outstanding balance on the April 8, 1981, note. Thus, Gentry's 1983 debt was a "future or additional" debt within and secured by the 1981 deed of trust because it was formally and legally incurred before the 1981 note was paid. (The converse assumption would stand logic on its head.) The same holds for the 1985 future advance. The 1981 deed of trust having thus been kept alive and saved from extinguishment under Section 89-1-49 and/or Section 89-5-21, it was alive and well on August 23, 1985, the date of Gentry's last refinancing. On that date, Credithrift made Gentry a loan of $11,215.13 (plus the future advance) and to evidence the same took Gentry's enforceable note before Gentry paid the outstanding balance on the July 12, 1983, note. The moment the August 23, 1985, loan was made, it became still another "future or additional" debt within and secured by the 1981 deed of trust, by reason of which by no stretch could Gentry's subsequent payment of the 1983 note activate the statutes and require Credithrift to cancel its 1981 deed of trust.
[4] In dissent, Justice Hawkins invokes Miss. Code Ann. § 89-5-19 (1972), which provides the lien of a deed of trust ceases when, on the face of the record, it appears time barred. The reference is inappropriate, because on the face of the record the obligation secured by Credithrift's 1981 deed of trust was alive and well at all relevant times  through and including today!

The deed of trust at bar provides for an aggregate installment debt of $23,679.36, incurred April 8, 1981, including add on interest at eighteen percent (18%) per annum, "Terms: 72 payments of $328.88 each" (from which one needs no special powers to know this probably means 72 monthly payments). The key (which Justice Hawkins omits from his dissenting opinion) is the interest rate: eighteen percent (18%) per annum. For one thing, from common usage we know installment notes like this are almost always payable monthly (as distinguished from weekly, semi-annually, etc.). Beyond this, we look at $23,679.76 payable in 72 installments of $328.88 each, including interest at 18%, and know intuitively this probably means for a six-year term, the 72 payment proviso being most suggestive.
Candor requires concession that precise mathematical calculation shows the intuitive mind in error  by one cent ($.01) or .0011%, depending on your point of view. Starting with the three "givens"  (1) 72 payments of (2) $328.88 each for (3) a total indebtedness of $23,679.36  a six year payout works only if the interest rate is 17.9989%. On the other hand, if we hold the interest rate of 18%, the last of the 72 payments must jump to $328.89, yielding Credithrift a windfall profit of one cent! [These calculations are made using the Truth In Lending Regulation Z Annual Percentage Rate Tables, 12 C.F.R. 226, Appendices D and J.] Of course, we know in addition to all of this, the note was made April 8, 1981. From what appears from the face of the record, we may easily calculate with precision that the last installment is due on or about March 8, 1987. The statute of limitations then enforceable on written contracts including promissory notes was six years from the date the last payment was due, as Justice Hawkins points out. The six-year statute would expire March 8, 1993. Add the six-month grace period, and we readily see nothing in Section 89-5-19 that need concern us until September 8, 1993, which may explain why neither Shutze nor the Chancery Court nor anyone else has so much as mentioned the statute until today. That the maturity date is not expressed but must be inferred is of no consequence where, as here, from the facts given, the inference is so conclusive. We have sanctioned far looser inferences. See Leach v. Tingle, 586 So.2d 799, 803-04 (Miss. 1991).
[5] The record reflects that at the time of foreclosure, the Gentrys owed Credithrift $10,739.65. Neither party discusses the question of whether this sum reflects unpaid portions of the Gentrys' refinanced indebtednesses or the new advances made in August of 1985. Nothing turns on the point, and we make no effort to decipher it.
[6] A testament to the healing power of time, we seem to have forgotten a citation to "42 Miss." was once unthinkable. See, e.g., Simmons v. Bank of Mississippi, 593 So.2d 40, 42 (Miss. 1992); Bondafoam, Inc. v. Cook Construction Co., Inc., 529 So.2d 655, 658 (Miss. 1988); State Security Life Insurance Co. v. State, 498 So.2d 825, 830 (Miss. 1986); Natural Father v. United Methodist Children's Home, 418 So.2d 807, 809 (Miss. 1982); but see, Matter of Estate of Childress, 588 So.2d 192, 195 n. 4 (Miss. 1991). We think the Summers & Brannin case persuasive, notwithstanding it was decided by a court many once thought alien. See Lusby v. Kansas City, Memphis & Birmingham Railroad Co., 73 Miss. 360, 371, 372, 377, 19 So. 239, 242, 244 (1896).
[7] We are reassured that our traditional view is the modern view. The current draft of Restatement of the Law (Third), Property-Security Mortgages provides:

§ 2.3 Priority of Future Advances
(a) If a mortgage secures future advances, all such advances have the priority of the original mortgage.
The point is explained in commentary and then illustrated with a case legally analogous to today's.
Comment:
Priority of future advances in general. This section recognizes that all future advances take the priority of the original mortgage. There is no distinction between advances that the mortgagee is contractually obligated to make and those that are option.
Illustration:
1. Mortgagor borrows $50,000 from Mortgagee, and executes a note and mortgage which state that future advances up to an additional $25,000 may be made by Mortgagee in the future. However, Mortgagee has no obligation to make such advances. The mortgage also states that it secures interest at 10% per annum and Mortgagee's attorneys' fees in any collection action. Thereafter J obtains a judgment against Mortgagor and properly records it so as to impose a lien on Mortgagor's real estate. Mortgagee has actual knowledge of this lien. Then Mortgagee lends and Mortgagor accepts an additional $25,000 advance. Mortgagor defaults on the loan, owing the full balance and $10,000 in interest. Mortgagee may recover in foreclosure the $75,000 balance, the $10,000 of interest, and Mortgagee's attorneys' fees to the extent permitted by local law. All of these items have priority over J's lien.
Restatement of the Law (Third), Property-Security (Mortgages) § 2.3, pp. 88, 90 (Tent. Dr. No. 1, March 22, 1991).
[8] This was in a day when no one would have dreamed of citing "42 Miss.," though Summers & Brannin obviously supports the Candler holding.
[9] No small irony attends the Chancery Court's implicit reliance on North to hold for Credithrift, viz, the Court's finding of fact that Credithrift "had no actual notice of ... [Shutze's] judgment" when in 1985 it refinanced Gentry and made him a new advance.
[10] The proposed new Restatement finds the obligatory/optional distinction "impossible to apply ... coherently in practice" and rejects it. Restatement of the Law (Third), Property-Security (Mortgages) § 2.1, Comment a, p. 48, and § 2.3, Reporters' Notes, pp. 94-95 (Tent. Dr. No. 1, March 22, 1991). A generation ago, Prof. Gilmore dissected this "conceptually nonsensical distinction" and explained

there are few, if any, future advance clauses which an astute judge cannot, at will, classify on one side or the other of the line between obligatory and voluntary.
2 Gilmore, Security Interests in Personal Property § 35.4, p. 930 (1965).
[11] Other states have other rules. Outside the North majority, however, everyone else reads Witczinski and progeny as we read them. See, e.g., Osborne, Mortgages § 120 (1951); Jones, Mortgages §§ 447, 452, 454, 455, 457 (8th Ed.) (1928); 2 Gilmore, Security Interests in Personal Property § 35.4 fn. 7 and accompanying text (1965); Blackburn, Mortgages to Secure Future Advances, 21 Mo.L.Rev. 209, 228 (1956); Annotation, 138 A.L.R. 566, 576-77 (1942).
[12] The Whiteway opinion recites that, prior to the 1976 advance, Percy Lee Green "had not revealed ... to the loan company" the fact of his conveyance to his father. 434 So.2d at 1352. This fact in no way informs or controls the Court's subsequent legal analysis.
[13] See Restatement of the Law (Third), Property-Security (Mortgages) § 2.3(b) (Tent. Dr. No. 1, March 22, 1991).
[14] The Court below used the phrase "actual notice." From the context, including the proof at trial, the Court obviously meant "actual knowledge" as distinguished from "constructive notice" or "constructive knowledge." Compare Miss. Code Ann. § 75-1-201(25) thru (27) (Supp. 1991).
[15] Nothing said here should be read to question our settled rule that, if the future advances are made under a construction loan and the intervening lien is a mechanic's lien, the construction advances are subordinated to the mechanic's lien to the extent that the lender did not use reasonable diligence to ensure that the funds were used in payment for labor and materials on the site. Peoples Bank & Trust Co. v. L & T Developers, Inc., 434 So.2d 699 (Miss. 1983); Deposit Guaranty Nat'l Bank v. E.Q. Smith Plumbing & Heating, Inc., 392 So.2d 208 (Miss. 1980).
[16] Restatement of the Law (Third), Property-Security (Mortgages) § 2.1, Comment c, p. 49 (Tent. Dr. No. 1, March 22, 1991).
[17] Prof. Gilmore's is the most prominent pursuit of this priority problem under UCC Article 9 as originally adopted in this state. 2 Gilmore, Security Interests In Personal Property, § 35.6 (1965); but see, Note, Priority of Future Advances Lending Under the Uniform Commercial Code, 35 U.Chi.L.Rev. 128, 132-37 (1967).
[18] Miss. Code Ann. § 75-9-301(4) (Supp. 1991), in its entirety, reads:

A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within forty-five (45) days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.
See Miss. Laws, ch. 343, § 1 (1986).
Section 75-9-301(4) is taken verbatim from the 1972 Amendments to the Official Text of the Uniform Commercial Code. 3 U.L.A., Uniform Commercial Code 334-35 (1981).
[19] See, e.g., Mississippi Bankers Association UCC Form No. 4 (September, 1967) published in Bank Manual on Articles Four and Nine, Mississippi Uniform Commercial Code 136-37 (1967).
[20] For what it may be worth, the National Conference of Commissioners on Uniform State Laws in 1975 promulgated the Uniform Land Transactions Act. UTLA § 3-301(b)(2) provides:

(b) A recorded security interest takes priority as of the date of its recording as to advances or obligations thereafter made or incurred under the security agreement:
(2) If not made pursuant to a commitment made before the secured party had knowledge of an intervening interest, to the extent of advances or obligations outstanding when the secured party obtained knowledge of the intervening interest and that do not exceed the maximum amount stated in the record; ...
13 U.L.A. 590 (1986). Ten years later the NCCUSL promulgated a Uniform Land Security Interest Act, Section 302(c)(2) of which says the same thing. 7A U.L.A. 210 (1992 Supp.). If this were our rule, Credithrift would still prevail over Shutze.
[1] § 89-5-19. When a lien appears by the record to be barred, it ceases.

Where the remedy to enforce any ... deed of trust, or other lien on real or personal property which is recorded, appears on the face of the record to be barred by the statute of limitations (which, as to a series of notes or a note payable in installments, shall begin to run from and after the maturity date of the last note or last installment), the lien shall cease and have no effect as to creditors and subsequent purchasers for a valuable consideration without notice, unless within six (6) months after such remedy is so barred the fact that such ... deed of trust, or lien has been renewed or extended be entered on the margin of the record thereof, by the creditor, debtor, or trustee, attested by the clerk, or a new ... deed of trust, ... noting the fact of renewal or extension, be duly filed for record within such time. If the date of final maturity of such indebtedness so secured cannot be ascertained from the record the same shall be deemed to be due one year from the date of the instrument securing the same for the purpose of this section....
[1] ... Professor Grant Gilmore has argued that this very uncertainty is the principle [sic] virtue of the rule:

Nevertheless, the conceptually nonsensical distinction between "obligatory" and "voluntary" has had the result (which is not in the least nonsensical) of preserving (or creating) a wide area of judicial discretion. There are few, if any, future advance clauses which an astute judge cannot, at will, classify on one side or the other of the line between obligatory and voluntary. When he has picked his label, he has also picked his priority rule ... Only a very wise or a very foolish man would be willing to state, categorically, where the truth lies and to propose a rule for application in all possible situations. There is, then, much to be said for having no rule at all, or only a make-believe rule, and for letting the judges decide; judges are not necessarily wiser than other people, but they are paid to decide things.
[G. Gilmore, Security Interests in Personal Property § 35.4 (1965).]
Gilmore's argument is appealing but ultimately unconvincing. The cost of learning the answer in a particular case, stated in terms of attorney's fees, court costs, and the time of witnesses, is far too high. A rule which could be applied with certainty, whatever its context, would be preferable.
G. Nelson & D. Whitman, Real Estate Finance Law 888-89 (2nd Ed. 1985).